## Case No. 6,812.

### The H. P. BALDWIN.

[Brown, Adm. 300.] [1]

District Court, E. D. Michigan. April, 1871.

COLLISION — VESSELS CLOSE-HAULED ON OPPOSITE TACKS—LOOKOUT.

1. Where a bark, close-hauled upon the starboard tack, was approaching a schooner close-hauled upon her port tack. at an angle of about six points, *held*, that the bark had the right to keep steadily on her course. so long as there was any room for doubt as to the intentions of the schooner.

[Cited in The F. W. Gifford, Case No. 5,166.]

2. The fact that the entire crew of the bark, including the lookout, were engaged, shortly before the collision, in tacking the ship, though a fault, was *held* not to have contributed to the collision, as they had resumed their duties a sufficient time before it took place.

3. The fact that the schooner was disabled, and partially unmanageable. did not impose upon the bark the duty of avoiding her, unless the disability was manifest to those upon the bark.

4. The fact that the lookout of the schooner was engaged, with the remainder of the watch, just previous to the collision, in hauling down the flying jib, which had become disabled, was a fault directly contributing to the disaster.

[Cited in The Ancon, Case No. 348.]

Libel and cross-libel for collision between the schooner Marquette and the bark H. P. Baldwin. The collision. occurred between two and three o'clock in the morning of the 10th day of July, 1870, in the Straits of Mackinaw, south of the center of the channel, and off from and a little west of "Old Fort Mackinaw," so called. Both vessels were bound up through the straits—the schooner on a voyage from Oswego to Chicago, and the bark on a voyage from Bay City to Chicago. The wind was west southwest, although somewhat variable, and the night was clear, with occasional scudding clouds. When the two vessels first made each other, they were both close-hauled and running by the wind, but upon opposite tacks—the schooner on the starboard tack, and the bark on the port tack. On nearing each other, the bark. as was her duty, kept off a point or so and passed the schooner under her stern. Each vessel, having subsequently come about, found herself again crossing the other's track, close-hauled and running by the wind as before, but on the opposite tacks, the bark now being on the starboard tack and the schooner on the port tack. It was while on these courses the collision occurred, the bark striking the schooner on her starboard side, just abaft the main rigging, and sinking her in about five minutes. Just before the collision. the flying jib pendant of the schooner was carried away by a squall. and the flying jib had in consequence been hauled down. This gave

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

the schooner a tendency to somewhat eat up into the wind, and made it more difficult to keep her away, but did not materially lessen her headway, which was still about three miles an hour. Each vessel kept her course without anything being done by either to avoid a collision, until a collision was imminent (and in view of the manoeuvres then made by each was, in fact, inevitable), when the wheel of the bark was ordered hard up (astarboard), and that of the schooner was ordered hard alee (also astarboard). This order on the part of the schooner brought her up into the wind and stopped her headway, or nearly so, and it was while she was in this position that the bark came into her, as before stated.

The faults charged in the libel against the bark were: (1) That she had not a proper lookout properly placed, and attentive to his duty. (2) That she had no competent officer on deck on watch attending to the safe navigation of the vessel. (3) That the proper measures were not taken and orders given in due and sufficient time to avoid the schooner as she lay helpless and disabled. (4) That she came too near the schooner before any efforts were made to avoid her as she lay helpless and disabled.

The faults charged in the libel against the schooner are: (1) That she had no proper and competent lookout. (2) That she did not keep out of the way of the bark. (3) That she was not properly equipped and manned, and her officers and crew were not at their proper posts and attentive to their duty.

W. A. Moore, for the Marquette.
H. B. Brown and G. V. N. Lothrop, for the Baldwin.

LONGYEAR, District Judge. The evidence showed that each vessel, after she had come about the last time before the collision, laid her course by the wind, and was sailing close-hauled, the schooner on the port tack and the bark on the starboard tack, up to just before the collision, and that the schooner would sail within about six points and the bark within about five and a half points of the wind. The wind being west southwest, the course of the schooner must have been about northwest, and that of the bark about south half west. The two vessels were, therefore, crossing so as to involve risk of collision, and article 12 of the collision act of April 29, 1864 (13 Stat. 60), applies. By article 12 it was the duty of the schooner to keep out of the way of the bark, and not having done so, the onus is upon her to show some fault on the part of the bark which caused, or at least contributed to, the collision, in order to a recovery against the bark. The Western Metropolis [Case No. 17,440]; The Black Prince [1 Lush. 568].

I will therefore proceed first to examine the allegations of fault on the part of the bark: (1) That the bark had not a proper lookout properly placed and attentive to his duty. (2) That she had no competent officer on deck or watch attending to the safe navigation of the vessel.

These two allegations will be considered together. I do not think these allegations are sustained by the proofs. It is true that, on coming about, the entire watch, including the lookout and the officers of the deck, were engaged in that manoeuvre. While this was in and of itself a fault, it is not such a fault as will make the bark responsible, unless it was the cause of or in some manner contributed to the collision. I think there is a clear preponderance of evidence that the entire watch had resumed their respective duties, and were properly attending to them a sufficient length of time before the collision, to take away all probability that their previous digression from their proper duties contributed in any manner to the accident. The remaining allegations of fault on the part of the bark will also be considered together. They are as follows: (3) That the proper measures were not taken and orders given in due and sufficient time to avoid the schooner as she lay helpless and disabled. (4) That she came too near the schooner before any efforts were made to avoid her as she lay helpless and disabled.

These allegations of fault on the part of the bark necessarily assume: (1) That the schooner had become so disabled and helpless as to prevent her keeping out of the way of the bark, as was her duty. (2) That such disability occurred a sufficient length of time before the collision for the bark to have taken measures to avoid the schooner. (3) That the disability and helplessness of the schooner were known to those in charge of the navigation of the bark, or that the disability was of such a character that, by the exercise of ordinary care and watchfulness on board the bark, it could have been readily seen and its effect understood by them in season for the necessary measures to be taken on board the bark to avoid a collision.

The fact that measures might have been taken, orders given, or efforts made, on the part of the bark, which would have prevented the catastrophe, is not enough. Circumstances must be shown that would make it the duty of those in charge of the navigation of the bark to take the measures, give the orders, or make the efforts. Williamson v. Barret, 13 How. [54 U. S.] 109. It will be readily seen that, under this rule, all the conditions assumed must have existed, in order to make out the allegations of fault last above recited.

First, then, as to the character and effect of the disability: In consequence of the flying jib pendant being carried away by a squall, it became necessary to haul down the flying jib, and it was done accordingly,.

and this was the full extent of the disability. The effect of it upon the navigation of the vessel was to make her less manageable, not to make her unmanageable. It gave her a tendency to eat up into the wind, and she would not keep away as quickly as she would with the flying jib up; it checked her headway, but did not stop it entirely, or even very nearly. In fact, the wheelsman had not noticed that it had any effect upon the steering of the vessel. It was then but a partial disability at most—such an one as, while it did not render the schooner helpless, made it necessary for her to have more time to get out of the way of another vessel than she would have needed but for the accident.

Secondly, as to the length of time between the accident and the collision: The evidence shows that the flying jib was hauled down immediately after the pendant was carried away, but how long the downhaul occupied does not clearly appear, but, from all the circumstances, it could have been only a very few minutes; one of the witnesses who assisted thinks it was five minutes. I think it could not have exceeded that, at most. The evidence does, however, clearly show that the completion of the downhaul, the order of the master of the schooner, "ready about" and "hard alee," the coming up of the schooner into the wind and the collision followed each other in quick and rapid succession—so quick and rapid as to leave but little room for doubt that the collision was inevitable at the completion of the downhaul. There may have been sufficient time after the flying jib pendant was carried away, if that accident had been detected by those in charge on board the bark the moment it occurred, for such measures to be taken on board the bark as would have avoided a collision.

We will therefore pass to the consideration of the third condition named, viz., the knowledge of the disability of the schooner, or responsibility for want of knowledge of it, on board the bark, in season to adopt the necessary measures to avoid a collision: That those in charge of the navigation of the bark did not, in fact, know of the accident to the schooner's flying jib, the evidence is clear and uncontradicted. Was the accident, then, of such a character that, by the exercise of ordinary care and attention on board the bark, it could have been readily seen, and its effect understood by them? It must be borne in mind that it was in the night, and although it was light enough so that outlines of a vessel could be seen at a considerable distance, yet it was not so light that it could be readily distinguished how a vessel carried her sails; and although perhaps unusual, yet it is not so unprecedented for a schooner of the size of the Marquette to be under way without her flying jib up, as to warrant the court in holding, as matter of law, that an approaching vessel must take notice of a want of it, and that such want of it is evidence of such disability as to excuse the vessel from obeying the ordinary rules of navigation. But so it must be held, in order to hold the bark responsible for not taking notice of the accident to the schooner.

But it is claimed that, laying aside the accident to the schooner, the bark had no right unnecessarily to run her down, even though the schooner may have been in fault in the first instance for not keeping out of the bark's way. This is no doubt correct. The evidence shows that the schooner's green light was made from the bark when from one and a half to two miles distant, and that the mate, on being interrogated by the master on two or three occasions whether the schooner was doing anything to keep out of the way, replied that he could not see as she was. Upon this it is claimed it became the duty of the master of the bark himself to take measures to keep out of the way of the schooner. But when did this duty begin? It will not do to say that it began when it became probable that the schooner did not intend to get out of the way, because by article 18 it was the duty of the bark to keep her course, and it would not do for her to change it so long as there was any room for doubt as to the intentions of the schooner. So long as there was sufficient space left for the schooner to keep away and pass the bark on the port side, as it was fair to presume she would do, it was not safe for the bark herself to keep away and attempt to pass under the stern of the schooner. And so long as the schooner kept her course, as she seemed disposed to do, it was not safe for the bark to come up into the wind, because by so doing she would necessarily throw herself across the bows of the schooner, and at the same time become unmanageable, thus placing herself in peril, a thing which the law never requires of one vessel in order to avoid danger to another.

We see, then, that up to the very point where the space between the two vessels ceased to be sufficient for the schooner to keep away, and thus avoid the bark, all was in doubt and gross uncertainty to those in charge of the bark, as to what the schooner would do. Certainly, up to this point it cannot be said that any duty had devolved upon the bark to take measures to avoid a collision. And who shall say just when that point was passed? This court cannot, and will not assume to say. The master of the bark stood there with all the circumstances before him, and no doubt used his best judgment, and acted accordingly. And although it is now quite apparent that if he had given the order he did give a little sooner, a collision would have been avoided, yet in view of the doubts with which the matter was surrounded at the time, I cannot say it was his duty so to have given the order, and that the bark is liable because the or-

der was not so given. It is contended also that the order which was given on board the bark was the wrong order; that it should have been "hard down," and the bark thereby brought up into the wind, alongside the schooner, and a collision avoided. I think it is quite clear from the evidence that the order "hard up" was given on board the bark before the order "hard-a-lee," which brought the schooner into the wind, was given. Hence, when the order was given by those in charge of the bark, it was still all in uncertainty with them what order would be given on the schooner, or whether any would be given at all. It is quite apparent now, that if no order whatever had been given on board the schooner, a collision would probably have been avoided, or if not, the blow would have been a glancing one, and probably light; and that if the opposite order had been given on the schooner to the one which was given, and her stern thereby thrown away from the bark, a collision would, quite probably, have been entirely avoided. I think that the order given on board the bark, under the circumstances in which it was given, was the right order, and even if it was not, the circumstances of doubt under which it was given—circumstances for the existence of which the bark was not responsible—were such as to make it no fault.

As we have already seen, the schooner was under headway up to the time she was thrown head to the wind, and that this occurred but a moment before the collision, and after the order "hard up" had been given on board the bark. Hence, up to that moment, the schooner must be considered as a vessel in motion, whose duty it was to keep out of the way of the bark, and the case comes clearly within the principle of those decisions cited by the bark's advocate, holding that where a vessel commits an error under impending danger, or in extremis produced or brought about by another vessel, such error cannot be alleged as a fault by such other vessel. See Bentley v. Coyne, 4 Wall. [71 U. S.] 509, 512; The Nichols, 7 Wall. [74 U. S.] 656, 666; The Fairbanks, 9 Wall. [76 U. S.] 420, 424; The City of Paris, Id. 634, 638; The Scranton [Case No. 12,558]; The Western Metropolis [Id. 17,440]. I hold, therefore, that none of the allegations of fault against the bark are sustained.

The remaining questions for consideration are those arising upon the libel of the owners of the bark against the schooner for damages sustained by the bark by the same collision. The allegations of fault on the part of the schooner, are: (1) That the schooner had no proper and competent lookout. (2) That the schooner did not keep out of the way of the bark. (3) That the schooner was not properly equipped and manned, and that her officers and crew were not at their proper posts attentive to their duty.

As to the first allegation, the only evidence there is upon the subject tends to prove that the schooner had on board a proper and competent lookout. Whether he was at his proper post and attentive to his duty or not is another question, and will be considered under the second clause of the third allegation of fault. The first allegation, therefore, is not sustained.

As to the second allegation, there is no dispute as to the fact that the schooner did not keep out of the way of the bark, but it is sought to be excused on account of the accident to the flying jib pendant of the schooner, in consequence of which, it is claimed, she could not get out of the way. This excuse will now be considered in connection with the third and last allegation. As has already been seen in considering another branch of the case, the accident to the flying jib pendant of the schooner caused only a partial disability, and I think the evidence clearly shows that, notwithstanding the accident, the schooner could have kept away and avoided the bark if she had seen the bark in time to have effected the necessary manoeuvres for that purpose, and that the only reason she did not do so was, the close proximity of the bark when she was first seen from the schooner. I think it quite clear from the proofs that the schooner had not time, even if she had been in full trim, to make the necessary manoeuvres to avoid the bark after she first saw her. The closeness of the proximity, and the shortness of the time, are best determined by what occurred on board the schooner between the time the bark was first seen and the collision. Immediately upon seeing the bark the master of the schooner gave his order "ready about," and then, as soon as that order could be executed, which, of course, was almost instantly, came the order "hard-a-lee," repeated three times in a loud voice, and then almost immediately came the collision. The extreme shortness of time between the last order and the collision is shown by the men who had turned in and were awakened by hearing the order. They had barely time to spring out of their berths and run upon deck when the collision came—in fact, one of them tells us that he was helped out of his berth by the force of the blow.

The proof is satisfactory to my mind that the bark was in sight, and with ordinary care and attention on board the schooner might and would have been seen much sooner than she was, and in ample time for the schooner, slightly disabled as she was, to have kept out of the bark's way. Why, then, was she not seen sooner than she was? I think this question is fully answered by two facts in the case. Captain Allen, master of the schooner, who was in charge of her navigation at the time, tells us that after the bark had passed him on her port tack, he "did not pay any attention to her, as I

thought she was clear of us for the night." The other fact is that the entire watch on board the schooner, except the wheelsman, including the lookout, were engaged, just at the critical moment, in hauling down the flying jib. It was during this time, and while the lookout was thus away from his post and attending to other duties, that the bark was allowed to approach to such fatal nearness to the schooner, and I think that to this fact the collision is justly attributed.

The supreme court, in the case of The Catharine, 17 How. [58 U. S.] 177, makes use of the following language: "As to the Catharine, we are not satisfied that she had a proper lookout on the vessel at the time of the collision. The excuse given is, that all hands, a short time previously, had been called to reef the sails, and some evidence is given to prove that this is customary in vessels of this description. However this may be in the day time, we think that such a custom or usage cannot be permitted as an excuse for dispensing with a proper lookout while navigating in the night, especially on waters frequented by other vessels;" and in this case it may be added, especially with the knowledge of the fact that the bark was somewhere in the vicinity, and might, at any time, come about, and be again crossing the schooner's course.

I think, therefore, that the lookout leaving his post to aid in the flying jib downhaul was a fault, which directly contributed to, if it was not the sole cause of the collision. What the schooner might or might not have been able to do to keep out of the way, if her lookout had been at his proper post, and the bark had been seen when still at a safe distance, is mere matter of conjecture, and something with which we have no concern. The fault consists in the lookout not being at his post, and the bark not being seen. I suggest, however, that if the lookout had been at his post, and the bark had been seen in time, as she might, and no doubt would have been, for the schooner to have made an effort to keep out of the way of the bark, and she had found such effort unavailing, or, knowing that she could not keep out of the way, have notified the bark by some signal of her disabled condition, as she in such case would have had time to do, she then would have done her whole duty, and would have been excused. As it is, her excuse for not keeping out of the way is unavailing, and she must be held to respond for the damages done to the bark. A decree must be entered dismissing the libel of Allen and Burt against the bark H. P. Baldwin, with costs, and in favor of the libellant Hudson, against the schooner Marquette, for the damages sustained by the bark H. P. Baldwin, and for costs, and referring it to a commissioner to ascertain and compute such damages. Decree for cross-libellant.